# 14-2776-cv

# United States Court of Appeals
### *for the*
# Second Circuit

———————◆———————

MARK J. PODLIN, PODLIN INTERNATIONAL REALTY LTD.,

*Plaintiffs-Appellants,*

— v. —

NADER GHERMEZIAN, DONALD GHERMEZIAN, RAPHAEL
GHERMEZIAN, TRIPLE FIVE WORLDWIDE, TRIPLE FIVE GROUP LTD.,
ABC CORPORATIONS, 1-10, TRIPLE FIVE WORLDWIDE DEVELOPMENT
COMPANY LLC, MEDOWLANDS DEVELOPMENT LLC, AMEREAM LLC,
AMEREAM DEVELOPMENT, LLC, MEADOW A-B OFFICE, LLC, MEADOW
C-D OFFICE, LLC, MEADOW ERC DEVELOPER, LLC, MEADOWLANDS
ONE LLC, MEADOW BASEBALL, LLC, MEADOW HOTEL, LLC,

*Defendants-Appellees,*

*(For Continuation of Caption See Inside Cover)*
———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

THOMPSON HINE LLP
*Attorneys for Plaintiffs-Appellants*
335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680

TRIPLE FIVE, L.L.C., TRIPLE FIVE PROPERTIES, LLC, TRIPLE FIVE NY, LLC, TRIPLE FIVE INTERNATIONAL INC., TRIPLE FIVE HOLDINGS, L.L.C., NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, CHRIS CHRISTIE, GOVERNOR, COLONY CAPITAL, LLC,

*Defendants.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Podlin International Realty, Ltd. is a private nongovernmental corporate party.  It has no parent corporation and no publicly held corporation owns any of its stock.

Table of Contents

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE...........................................................................3

    A.    Statement of the Facts ..........................................................................5

        1.    Mark J. Podlin And Podlin International Realty Ltd..................5

        2.    The Ghermezians And The Triple Five Defendants..................5

        3.    The Employment Agreement......................................................6

    B.    Relevant Procedural History ................................................................8

APPLICABLE LEGAL STANDARD OF REVIEW............................................10

SUMMARY OF THE ARGUMENT ..................................................................10

ARGUMENT ..................................................................................................14

    I.    The District Court Erred In Applying The New Jersey Broker's Licensing Statute to Plaintiffs' New York Law Employment Contract Claim....................................................................................................14

    A.    Podlin's Lack of A New Jersey Real Estate Broker's License Is No Bar To Recovery Of The Commission Compensation Under His Employment Agreement......................................................................14

        1.    Under New York Law, Which Governs the Employment Agreement At Issue, Podlin May Recover His Agreed-Upon Compensation Related To The Xanadu Project.......................14

            (a)    There Is No Conflict Of Laws Between New York And New Jersey Law On These Facts....................................15

            (b)    New York has the most significant relationship to this transaction and to the parties. ..........................................17

            (c)    Under New York Law, Podlin is entitled to recover his commission. ..................................................................24

        2.    The New Jersey Real Estate Broker's Licensing Statute Does Not and Should Not Be Applied to Employment Agreements.28

        3.    Triple Five's Involvement With Xanadu Was A Business Transaction, Not A Purchase And Sale of Real Estate.............32

        4.    New Jersey's Licensing Statute Does Not Bar Podlin's Recovery Under The Facts Pled In This Case. .........................35

5.    New Jersey Law Does Not Bar Podlin From Receiving Compensation Based Upon The Non-Real Estate Assets Conveyed In The Xanadu Transaction. ....................................37

II.    The District Court Committed Reversible Error in Dismissing Plaintiffs' Fraud Claims............................................................38

A.    Plaintiffs' Fraud Claims are Pled In The Alternative ...........................38

B.    Plaintiffs' Fraud Claims are Not Duplicative of Plaintiffs' Breach of Contract Claim....................................................................40

C.    The Conspiracy to Commit Fraud Claim was Erroneously Dismissed 44

III.    The Complaint Adequately Alleges Facts To Support Piercing The Corporate Veil....................................................................45

IV.    The District Court Improperly Limited Podlin's Unjust Enrichment and Quantum Meruit Claims .........................................................50

CONCLUSION ......................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abacus Fed. Sav. Bank v. Lim*,
  75 A.D.3d 472, 905 N.Y.S.2d 585 (N.Y. App. Div. 1st Dep't 2010) ...............44

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009) ................................................41

*Advance Realty Assocs., Inc. v. First Bank Nat'l Ass'n*,
  No. 89 Civ. 4843 (SWK), 1991 U.S. Dist. LEXIS 4856
  (S.D.N.Y. Apr. 15, 1991)................................................................16, 21

*Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*,
  122 F.3d 130 (2d Cir. 1997) ............................................................45

*Arbeeny v. Kennedy Exec. Search, Inc.*,
  71 A.D.3d 177, 893 N.Y.S.2d 39 (N.Y. App. Div. 1st Dep't 2010) .................34

*Atla-Medine v. Crompton Corp.*,
  No. 00 Civ. 5901 (HB), 2001 U.S. Dist. LEXIS 5427 (S.D.N.Y.
  Apr. 26, 2001) ............................................................................39, 40

*Bradkin v. Leverton*,
  26 N.Y.2d 192, 309 N.Y.S.2d 192 (N.Y. 1970) .................................51

*Broadridge Secs. Processing Solutions, LLC v. Khashoggi*,
  507 Fed. Appx. 57 (2d Cir. 2013)......................................................45

*C. B. Snyder Realty Co. v. Sherrill-Noonan, Inc.*,
  261 F.2d 269 (3d Cir. 1958) ............................................................17

*Charles H. Greenthal Commer. Corp. v. Equity Residential Props.
  Trust*,
  300 A.D.2d 47, 751 N.Y.S.2d 181 (N.Y. App. Div. 1st Dep't 2002) ..........21, 22

*Cohen v. Lord, Day & Lord*,
  75 N.Y.2d 95, 551 N.Y.S.2d 157 (N.Y. 1989) ...................................34

*Consul, Ltd. v. Solide Enterprises, Inc.*,
  802 F.2d 1143 (9th Cir. 1986) ..................................................................16

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
  68 N.Y.2d 954, 510 N.Y.S.2d 88 (1986)...............................................43

*Dragushansky v. Nasser*,
  No. 12 Civ. 9240 (TPG), 2013 U.S. Dist. LEXIS 124074
  (S.D.N.Y. Aug. 29, 2013) ...............................................................*passim*

*Edward S. Gordon Co. v. Peninsula N.Y. P'ship*,
  245 A.D.2d 189, 666 N.Y.S.2d 170 (N.Y. App. Div. 1st Dep't
  1997) ............................................................................................................25

*Equis Corp. v. Mack-Cali Realty Corp.*,
  6 A.D.3d 264, 775 N.Y.S.2d 35 (N.Y. App. Div. 1st Dep't 2004) ...................18

*Eugene J. Busher Co. v. Galbreath-Ruffin Realty Co.*,
  22 A.D.2d 879, 254 N.Y.S.2d 673 (N.Y. App. Div. 1st Dep't
  1964), *aff'd*, 15 N.Y.2d 992, 260 N.Y.S.2d 12 (N.Y. 1965) .......................26, 27

*Fieger v. Pitney Bowes Credit Corp.*,
  251 F.3d 386 (2d Cir. 2001) ...........................................................*passim*

*Friedland Realty Inc. v. Piazza*,
  273 A.D.2d 351, 710 N.Y.S.2d 97 (N.Y. App. Div. 2d Dep't 2000)................26

*Getreu v. Plaxall Inc.*,
  261 A.D.2d 574, 690 N.Y.S.2d 694
  (N.Y. App. Div. 2d Dep't 1999)......................................................................26

*Greene v. Hellman*,
  51 N.Y.2d 197, 433 N.Y.S.2d 75 (N.Y. 1980).................................................26

*Gutkowski v. Steinbrenner*,
  680 F. Supp. 2d 602 (S.D.N.Y. 2010) ..............................................................51

*Karedes v. Ackerley Grp., Inc.*,
  423 F.3d 107 (2d Cir. 2005) .............................................................................10

*Kazmer-Standish Consultants, Inc. v. Schoeffel Instruments Corp.*,
  89 N.J. 286, 445 A.2d 1149 (N.J. 1982)......................................................*passim*

ii

*Kolodny v. Byrne*,
    No. 11-28718, 2012 N.Y. Misc. LEXIS 4873 (N.Y. Sup. Ct.
    Suffolk Cnty. Oct. 11, 2012) ...............................................................49

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ...............................................................41

*Lucas v. Gulf & W. Indus., Inc.*,
    666 F.2d 800 (3d Cir. 1981) ...............................................................16

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173, 919 N.Y.S.2d 465 (N.Y. 2011) ................................51

*Marriott Int'l, Inc. v. Downtown Ath. Club of N.Y. City, Inc.*,
    No. 02 Civ. 3906 (MBM), 2003 U.S. Dist. LEXIS 9570 (S.D.N.Y.
    June 6, 2003) .......................................................................................39

*Meyer v. JinkoSolar Holdings Co.*,
    No. 13-616-cv, 2014 U.S. App. LEXIS 14637 (2d Cir. July 31,
    2014) ...................................................................................................10

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
    418 F.3d 168 (2d Cir. 2005) ...............................................................51

*Miller v. Schloss*,
    218 N.Y. 400 (N.Y. 1916) ..................................................................51

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*,
    165 F. Supp. 2d 514 (S.D.N.Y. 2001) ................................................40

*Palkoski v Garcia*,
    19 N.J. 175, 115 A.2d 539 (N.J.1955) ..........................................30, 31

*Paulson v. Shapiro*,
    490 F.2d 1 (7th Cir. 1973) ...................................................................17

*Rosenberg & Rosenberg, P.C. v. Hoffman*,
    195 A.D.2d 343, 600 N.Y.S.2d 228
    (N.Y. App. Div. 1st Dep't 1993) .......................................................21

*RTC Mortg. Trust 1995-S/N1 v. Sopher*,
    171 F. Supp. 2d (S.D.N.Y. 2001),
    *aff'd*, 31 Fed. Appx. 37 (2d Cir. 2002) .............................................49

*Rule v. Brine, Inc.*,
　　85 F.3d 1002 (2d Cir. 1996) .............................................................50

*Sammarone v. Bovino*,
　　395 N.J. Super. 132, 928 A.2d 140 (N.J. Super. App. Div. 2007) .............*passim*

*Samsung Am. v. Yugoslav-Korean Consulting & Trading Co.*,
　　248 A.D.2d 290, 670 N.Y.S.2d 466 (N.Y. App. Div. 1st Dep't
　　1998) ....................................................................................................48

*Thomas J. Hayes & Assoc. v. Brodsky*,
　　101 A.D.3d 1560, 957 N.Y.S.2d 473 (N.Y. App. Div. 3d Dep't
　　2012), *lv denied*, 21 N.Y.3d 851 (2013)
　　.............................................................................................51, 52, 53, 54

*Tobias v. Comco/America, Inc.*,
　　96 N.J. 176, 475 A.2d 40 (N.J. 1984)...........................................*passim*

*Town of Haverstraw v. Columbia Elec. Corp.*,
　　237 F. Supp. 2d 452 (S.D.N.Y 2002) .............................................39

*Wall v. CSX Transp., Inc.*,
　　471 F.3d 410 (2d Cir. 2006) ...........................................................41

*Weston Funding Corp. v. Lafayette Towers, Inc.*,
　　550 F.2d 710 (2d Cir. 1977) ...........................................................23

*Xcellence, Inc. v. Arkin Kaplan Rice LLP*,
　　No. 10CV3304 (HB), 2011 U.S. Dist. LEXIS 26533 (S.D.N.Y.
　　Mar. 15, 2011)..................................................................................43

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
　　84 N.Y.2d 309, 618 N.Y.S.2d 609 (N.Y. 1994)........................17, 18

**Rules**

Federal Rule of Civil Procedure Rule 8(d) ...............................................39

Federal Rule of Civil Procedure Rule 9(b) ......................................12, 41

Federal Rule of Civil Procedure Rule 12(b)(6) ...................................10

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1332(a) ..........................................................................1

N.J. Stat. § 45:15-1, *et seq.* ....................................................passim

N.Y. Real Prop. L. § 442-d (2000) ......................................................14

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiffs-Appellants, Mark J. Podlin ("Mark Podlin" or "Mr. Podlin") and Podlin International Realty, Ltd. ("Podlin Int'l," and together with Mark Podlin, collectively "Plaintiffs"), bring this action under 28 U.S.C. § 1332(a) in that there is complete diversity and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. On July 29, 2014, the clerk of the District Court entered judgment pursuant to the District Court's July 29, 2014 Memorandum and Order. A-253. Plaintiffs timely filed their Notice of Appeal on July 29, 2014. A-254-255. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court erred on a 12(b)(6) motion to dismiss in holding that a New Jersey statute, which in most cases prevents recovery of New Jersey real estate commissions by brokers not licensed in New Jersey, bars an employee who is party to an oral employment contract governed by New York law (working on multiple projects within the United States and around the world) from receiving compensation from his employer for designing a redevelopment plan for, and being the procuring cause of the employer obtaining the consents and rights to redevelop and operate, a mall in New Jersey.

2.    Whether the District Court erred on a 12(b)(6) motion to dismiss in dismissing Plaintiffs' fraud claims as merely alleging misrepresentations concerning Defendants' intention to perform their obligations under an alleged oral employment contract even though Defendants do not admit the existence of the oral contract and Plaintiffs have pled fraud in the alternative.

3.    Whether the District Court erred in dismissing Plaintiffs' fraud claim where Plaintiffs have pled that Defendants made false statements after the oral contract was agreed to regarding the preparation of a written employment contract in order to induce Plaintiffs to continue performance of their services which ultimately led to Defendants obtaining redevelopment rights for a major U.S. mall project.

4.    Whether the District Court erred in dismissing Plaintiffs' claims (with prejudice) seeking to pierce the corporate veil despite sufficient allegations that the Defendant companies were not run as separate corporations and that the owners exercised complete domination over the corporations and that such domination was used to commit a fraud against Plaintiffs, and where Defendants themselves were solely in possession of further facts regarding the relationship between the Defendants.

## **STATEMENT OF THE CASE**

In February 2010, in New York, Defendants/Respondents the Ghermezians and the Triple Five Defendants (which entities are owned and controlled by the Ghermezians as part of their business enterprise) hired Mark Podlin pursuant to an oral employment agreement to be CEO of their Triple Five's "International Shopping Center Development Division." A-119.

As part of his employment, Defendants, among other things, wanted Podlin to win the consent of the State of New Jersey and the Sports and Exposition Authority (the "Sports Authority") necessary for Defendants to gain control of the redevelopment rights to the then-vacant Xanadu Meadowlands Mall, (subsequently renamed the American Dream@Meadowlands and hereafter referred to as "Xanadu"), located in the Meadowlands Sports Complex in South Rutherford, New Jersey, for the purposes of redeveloping the retail mall and entertainment complex into one of the largest such facilities in the world, all to their tremendous profit, gain and benefit. A-118-119.[1] The Ghermezians and the Triple Five Defendants had already tried and failed to get control of the Xanadu project. A-119.

Pursuant to the employment agreement, the Ghermezians and the Triple Five Defendants agreed to compensate Mr. Podlin with a monthly salary of $12,000 per

---

[1] References to "A-__" are to pages with the Joint Appendix.

month, plus a commission component equal to 10% of the appraised value of all project which Podlin succeeded in bringing in (including specifically the Xanadu project), plus 10% of the increased value of any such project based upon Podlin's development efforts after acquisition.  A-131-132.

Mark Podlin worked diligently to obtain the Xanadu project.    A-120. Among other things, he conceived of a specific redevelopment and repositioning plan that he knew would succeed for the project and which would be well-received by the Sports Authority.  A-120.  He also utilized his experience, project-specific expertise and critical contacts to reach out to the Sports Authority, the office of the Governor of New Jersey and numerous other influential persons to persuade them to support a grant of the consent to a transfer of control of the redevelopment of the Xanadu project to the Ghermezians and the Triple Five Defendants.  A-120.

Ultimately, Mark Podlin was successful.    But for Podlin's efforts, neither the Ghermezians nor the Triple Five Defendants would have succeeded in obtaining the redevelopment rights to Xanadu.  A-120-121.

Only after Mr. Podlin had done all that was necessary for the Ghermezians and the Triple Five Defendants to obtain control of the project, and succeeded for them where they had previously failed, did they inform him that they would not pay him.  A-121.

Subsequently, Plaintiffs filed the instant suit.

4

### A.    Statement of the Facts

#### 1.    Mark J. Podlin And Podlin International Realty Ltd.

Plaintiff/Appellant Mark J. Podlin is an attorney, real estate broker and consultant, and a registered investment advisor.  A-121-122.  Mr. Podlin is a registered real estate broker in the State of New York and is admitted to the practice of law in New York (as well as in Georgia and Illinois).  A-121-122.

Plaintiff Podlin International Realty, Ltd. is wholly owned by Mark Podlin and provides real estate development and investment services to various clients domestically and internationally.  A-122.

#### 2.    The Ghermezians And The Triple Five Defendants

Nader Ghermezian ("Nader"), Donald Ghermezian ("Donald"), Raphael Ghermezian ("Raphael," and together with Nader and Donald, the "Ghermezians") are members of the same family who own and control the Triple Five Defendants. A-118.

According to their website, the Ghermezians and the Triple Five Defendants, which go by the name and/or do business as The Triple Five Group and/or The Triple Five Group of Companies, are all part of "a multinational conglomerate and diverse development and finance corporation, with offices in major U.S. and Canadian cities."  A-123.

5

Each of the Ghermezians have a residence in the State of New York and the Triple Five Defendants (and the Triple Five Group) maintain offices in the State of New York.  A-122-125.

### 3.   The Employment Agreement

As detailed in the Amended Complaint, the Ghermezians and Triple Five posted a senior executive job opening in late 2009 on the website of the International Council of Shopping Centers (the "ICSC"), to which Plaintiff Podlin responded and submitted his resume.  A-128.  Podlin has recognized expertise in the retail and shopping center industry and is a member of the ICSC.  A-127-128.

Shortly after Podlin responded to the job posting, in February 2010, Defendants called Podlin and asked him to fly to New York for a meeting with them to discuss the employment position and one project they were particularly interested in – the Xanadu shopping center project in South Rutherford, New Jersey.  A-128-129.

After two days of discussions and negotiations in New York, the Ghermezians and the Triple Five Defendants hired Mark Podlin individually as CEO of their Triple Five "International Shopping Center Development Division" and specifically asked him to assist them in obtaining the redevelopment rights to the Xanadu project.  A-129-136.  Plaintiff and Defendants specifically agreed that Plaintiff's compensation would consist of both a base salary and commissions

based on the value of the projects generated by Plaintiff and based on enhanced values once the projects were renovated or re-developed, including the Xanadu project.  A-131-135.

Time was of the essence, as Triple Five believed another entity had the inside track on obtaining the consent from the Authority to take over the project. A-130.  Accordingly, Mark Podlin, while still in the State of New York, began work immediately and diligently pursued the required consents and approvals to assume control of the Xanadu project.[2]  A-137-142.

Among other things, Podlin conceived of a specific, sophisticated redevelopment and repositioning plan for Triple Five that he believed was essential for the project to be successful, and which addressed each of the items which were (in Podlin's view) the cause of failure of the project to date.  As such, Podlin believed his vision for the Xanadu project would be well-received by the Authority and would enhance Triple Five's chances of obtaining the necessary consent.  A-138.  He utilized his special experience, project-specific expertise and critical contacts to reach out to the Authority, the office of the Governor of New Jersey and numerous other influential persons to persuade them to either support or

---

[2] Also, while still in New York, Podlin began work on other projects and was involved in meetings in New York regarding a project related to Libya.  A-136, 138, 142.

7

approve the transfer of control of the redevelopment of the Xanadu project to the Ghermezians and the Triple Five Defendants.  A-138-144.

Ultimately, Mark Podlin was successful.  But for Podlin's efforts, neither the Ghermezians nor the Triple Five Defendants would have succeeded in obtaining the redevelopment rights to the Xanadu project.  A-154.

Only after Mr. Podlin had completed all that was necessary for the Ghermezians and the Triple Five Defendants to obtain control of the project did the Defendants inform him that they would not pay him.  A-143-144.

### B.    Relevant Procedural History

On May 28, 2014, the District Court issued a Memorandum and Order granting in part and denying in part Defendants' Motion to Dismiss.  A-220-235. The District Court dismissed Plaintiffs' claims for fraud, "procuring cause" liability, piercing the corporate veil, and breach of contract as to any commission relating to the Xanadu transaction.  A-235.  The District Court did not dismiss Plaintiffs' claims for unjust enrichment, quantum meruit, and breach of contract for a monthly salary (the "Remaining Claims"), but specifically instructed that under such claims "Podlin would remain ineligible to recover compensation for the Xanadu deal . . . ." A-231.

On June 19, 2014, Plaintiffs filed a Rule 41(a)(1) notice of voluntary dismissal of the Remaining Claims.  A-236-237.  On July 3, 2014, the District

Court vacated Plaintiffs' notice of voluntary dismissal. A-246-247. On July 9, 2014, Plaintiffs filed a motion to dismiss the Remaining Claims without prejudice under Rule 41(A)(2). A-248-249. On July 29, 2014, the District Court granted Plaintiffs' motion to dismiss the Remaining Claims on the condition that should the District Court's May 28, 2014 Memorandum and Order be affirmed by the U.S. Court of Appeals for the Second Circuit, Plaintiffs have waived their right to reassert the Remaining Claims. A-250-252. Also, on July 29, 2014, the clerk of the court entered judgment pursuant to the July 29, 2014 Memorandum and Order. A-253.

Plaintiffs timely filed their Notice of Appeal on July 29, 2014. A-254-255.

## APPLICABLE LEGAL STANDARD OF REVIEW

In reviewing a District Court's order dismissing claims pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court's scope of review is *de novo*. *Meyer v. JinkoSolar Holdings Co.*, No. 13-616-cv, 2014 U.S. App. LEXIS 14637, at *9 (2d Cir. July 31, 2014) (citing *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*, PLC, 709 F.3d 109, 119 (2d Cir. 2013)); *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005).  As part of its review, this Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Meyer*, 2014 U.S. App. LEXIS 14637, at *9 (internal citations and brackets omitted).  "At this stage, dismissal is appropriate only where appellants can prove no set of facts consistent with the complaint that would entitle them to relief."  *Id.*

## SUMMARY OF THE ARGUMENT

The dispute in this case centers around an employment contract negotiated, agreed to and finalized in New York.  All of Podlin's services were performed completely outside of New Jersey.  Neither Podlin nor Defendants engaged in any actions physically within the State of New Jersey in connection with Xanadu prior to the time Defendants breached the employment agreement – Defendants themselves having offices and apartments in New York.  The **only** connection to New Jersey is the location of the Xanadu mall.  An appropriate choice-of-law

analysis dictates that New York law should apply to the controversy. Under New York law, Podlin is entitled to recover a commission. *See Dragushansky v. Nasser*, No. 12 Civ. 9240 (TPG), 2013 U.S. Dist. LEXIS 124074 (S.D.N.Y. Aug. 29, 2013).

The District Court erred in applying the New Jersey broker's licensing, statute N.J. Stat. § 45:15-1, *et seq.* ("N.J. Licensing Statute"), to bar Podlin, an employee under a New York employment contract, from recovering compensation for services rendered **as an employee**. A-226-228. The language of the New Jersey statute makes clear that it does not apply to employees (with a singular exception for the sale of "lots" not applicable here) and there is no New Jersey precedent for applying the broker's statute to employment agreements or to disputes between employers and employees. *Id.* Indeed, the very purpose of the statute – "to protect consumers by excluding 'undesirable, unscrupulous and dishonest persons . . . from the real estate business'" – is completely inapplicable in the employment context. N.J.S.A. 45:15-3. No reported New Jersey case applies the licensing statute to bar an employee from recovering compensation from his or her employer.

Alternatively, even assuming *arguendo* that the agreement at issue could be construed as being, at least in part, a real estate brokerage arrangement, Podlin may nonetheless recover the commission portion of his compensation. The Xanadu

11

project was not, primarily, a "real estate transaction."  Podlin was not acting as a third party broker, and Podlin's services were not that of a "real estate broker."

The District Court's decision to dismiss Plaintiffs' fraud claims also constituted reversible error.  First, the dismissal of Plaintiffs' fraud claims on the grounds that the claims were duplicative of the breach of contract claim was erroneous because Defendants dispute the very existence of a contract and Plaintiffs are allowed to plead in the alternative.  Second, because Plaintiffs stated a claim for fraud and fraudulent inducement with the particularity required by Federal Rule of Civil Procedure Rule 9(b), and accepting the facts as true – as the District Court must at the pleading stage – the District Court should have permitted both the breach of contract and fraud claims to proceed.  Third, Plaintiffs' conspiracy to commit fraud claim was erroneously dismissed because Plaintiffs properly alleged the underlying fraud, as well as Defendants' collective effort to defraud Plaintiffs.

The District Court erred in dismissing Plaintiffs' claims (with prejudice) seeking to pierce the corporate veil despite sufficient allegations that the Defendant companies were not run as separate corporations and that the owners exercised complete domination over the corporations and that such domination was used to commit a fraud against Plaintiffs.  Bringing a claim to pierce the corporate veil in the instant action is entirely appropriate under New York law.  Moreover,

12

dismissal was particularly inappropriate where Defendants themselves were solely in possession of further facts regarding the relationship between the individual/principal and the corporate Defendants.

Finally, the District Court erred in holding that Podlin's unjust enrichment and quantum meruit claims must be limited to the value of one month's salary.

## **ARGUMENT**

I.   **The District Court Erred In Applying The New Jersey Broker's Licensing Statute to Plaintiffs' New York Law Employment Contract Claim.**

   A.   **Podlin's Lack of A New Jersey Real Estate Broker's License Is No Bar To Recovery Of The Commission Compensation Under His Employment Agreement.**

      1.   <u>Under New York Law, Which Governs the Employment Agreement At Issue, Podlin May Recover His Agreed-Upon Compensation Related To The Xanadu Project.</u>

On the motion to dismiss in the District Court, Defendants asserted that the New Jersey Licensing Statute, N.J. Stat. § 45:15-1, *et seq.*, barred Podlin from recovering that portion of his employment compensation related to the acquisition of the redevelopment rights to Xanadu. In response, the District Court undertook a choice-of-law analysis, framing the issue as follows:

> Both New York and New Jersey require that persons acting in-state as real estate brokers be licensed in-state in order to bring action for commissions. *See* N.J.S.A. 45:15-3 (2011); N.Y. Real Prop. L. § 442-d (2000). Podlin is a licensed real estate broker in New York but not New Jersey. (*See* Compl. ¶ 15.) Consequently, Podlin's claim for a commission stands on a different footing depending on which state's law applies.

A-225.

Based upon its analysis, the District Court decided to apply New Jersey law, and particularly the N.J. Licensing Statute, and dismissed Podlin's contract claims to the extent they sought the commission portion of his compensation related to the Xanadu Project. A-227-228. This was incorrect because (i) there is no conflict

14

between New York and New Jersey law under the specific facts of this case; and (ii) even assuming *arguendo* that there is a conflict, New York has the most significant relationship to the facts and the parties, and therefore New York law applies.

### (a)    There Is No Conflict Of Laws Between New York And New Jersey Law On These Facts.

The District Court wrongly found that there was a conflict of laws because Podlin was licensed as a real estate broker in New York, but not in New Jersey, and that his commissions claim "stands on a different footing depending on which state's law applies." A-225. However, on the facts alleged, there is no conflict of laws because the outcome would be the same under New York and New Jersey law.

Initially, as set forth below, the N.J. Licensing Statute does not apply to employees seeking compensation from their employers in the context presented by this case. N.J. Stat.§ 45:15-1, *et seq*.

Even if, assuming *arguendo*, New Jersey's real estate licensing statute were applied, Podlin would be entitled to his commission because Plaintiffs' services were performed completely outside of New Jersey. A-136-142. Courts recognize that a broker may receive a commission for services performed in connection with land in a state where the broker is unlicensed when his services were performed outside of the state.

15

For example, recently in *Dragushansky*, 2013 U.S. Dist. LEXIS 124074, the District Court sitting in New York held that the New Jersey Licensing Statute did not bar a New York licensed broker and attorney from sustaining a claim for commissions where the only contact with New Jersey was the location of the property: "The only connection this case has to New Jersey is that the property for which Dragushansky seeks brokerage commissions is located in New Jersey." *Id.* at *15-16. *See also*, *Advance Realty Assocs., Inc. v. First Bank Nat'l Ass'n*, No. 89 Civ. 4843 (SWK), 1991 U.S. Dist. LEXIS 4856 (S.D.N.Y. Apr. 15, 1991) (New York had the primary interest where a New York broker sued for commission on the sale of Georgia property).

In construing a statute substantially similar to the New Jersey statute, the court in *Consul, Ltd. v. Solide Enterprises, Inc.*, 802 F.2d 1143, 1150 (9th Cir. 1986), held that a North Carolina-licensed real estate broker should be allowed commissions under an oral contract for providing consulting and brokerage services regarding property in California. The court found "that it was inappropriate on this record to dismiss the allegations involving the California properties for failure to state a claim" and held "that California would follow the other jurisdictions that do not bar recovery by a broker unlicensed in the state in which the property is located where no brokerage functions are performed in that state." *Id.* at 1151 (emphasis added); *see also*, *e.g.*, *Lucas v. Gulf & W. Indus.,*

16

*Inc.*, 666 F.2d 800, 801, 804-05 (3d Cir. 1981) (a New Jersey broker may receive a commission for the sale of mineral interests located in Florida because all the broker's services were performed outside of Florida, including correspondence and telephone calls); *Paulson v. Shapiro*, 490 F.2d 1, 4 (7th Cir. 1973) (Illinois-licensed broker's claim for commission arising out of the sale of Wisconsin real estate was not barred because plaintiff "engaged in no meetings, conversations, discussions or negotiations in Wisconsin"); *C. B. Snyder Realty Co. v. Sherrill-Noonan, Inc.*, 261 F.2d 269, 272 (3d Cir. 1958) (court refused to apply Pennsylvania broker licensure statute to bar action for a commission by plaintiff not licensed as a broker in Pennsylvania).

Since the outcome of this case under New York law would not conflict with the outcome under New Jersey law, no choice of law analysis need be undertaken.

> **(b)** **New York has the most significant relationship to this transaction and to the parties.**

Even assuming *arguendo* that a choice of law analysis is required, under such an analysis New York law clearly applies, because New York is where the most significant contact with the matters at issue occurred. It is incontrovertible that the dispute before the Court centers around an agreement that was negotiated, agreed to and finalized in New York.

New York utilizes "the 'center of gravity' or 'grouping of contacts' . . . approach to choice of law questions in contract cases." *Zurich Ins. Co. v. Shearson*

*Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 612 (N.Y. 1994) (citation omitted).  "The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" *Id.* (citation omitted).  To make this determination, courts must consider "the places of the contracting, negotiation and performance of the contract, the location of the subject matter of the contract, and the domicile or place of business of the parties." *Equis Corp. v. Mack-Cali Realty Corp.*, 6 A.D.3d 264, 266, 775 N.Y.S.2d 35, 37 (N.Y. App. Div. 1st Dep't 2004) (citing *Zurich Ins. Co.*, 84 N.Y.2d at 317, 618 N.Y.S.2d at 612).

The District Court erred in focusing on the *location of the Xanadu Mall* as the "center of gravity" of the *employment contract*.  *Zurich Ins. Co.*, 84 N.Y.2d at 317, 618 N.Y.S.2d at 612.  The focus should be on the employment relationship overall, not only on the Xanadu project, as this is a suit on the employment agreement as a whole and Podlin's employment involved activities on projects in a variety of places throughout the United States, Canada and the World.  In fact, the District Court's piecemeal approach would result in the absurd result of applying the substantive law of different states to the very same employment agreement depending upon which part of the contract is sought to be enforced.  The District Court found that "New Jersey has the largest interest in the contract" but why would New Jersey law apply to the surviving claim for a monthly salary?  A-227.

In addition to Xanadu, Podlin worked on many other projects during his employment by Defendants, including projects relating to Libya, Nigeria and the Congo.  A-136.  The District Court seems to imply that Podlin's claims for compensation under the employment contract would depend on what task he was doing at the time he sued.

It is undisputed that Podlin's employment contract with Triple Five <u>was negotiated, agreed to and finalized in New York</u>, including several face-to-face meetings here in New York and in this district.  A-129-137.  Podlin is licensed as a real estate broker and an admitted attorney in New York, and he commenced calling his contacts regarding the Xanadu project "while still in New York." A-120-122, 137.   In addition, Podlin began working on other projects while still in New York and met with Nader, Kevin O'Neil (Triple Five's head of International Construction) and others in New York in connection with a project in Libya. A-136.  Moreover, the Ghermezians are domiciled in New York, and the Triple Five Defendants maintain offices in New York.  A-122-125.

There are no allegations that Podlin ever entered the State of New Jersey in connection with his employment by Defendants.  As the District Court recognized, much of "Podlin's services were rendered at Triple Five's headquarters in Alberta, Canada."  A-226.  While the Xanadu project involved a business opportunity in

19

New Jersey, none of the other projects Podlin was working on under his employment agreement with Defendants related in any way to New Jersey.  A-138.

Where real estate is tangentially involved in an action, its situs may be considered but is not dispositive.  Although the law of the state where the real estate is located applies "when the validity of the conveyance itself is in question," "when an action involves real estate but does not challenge the title to, or succession or conveyance of, property, the situs of the property is viewed as one in 'the spectrum of significant contacts' considered in connection with the conflict-of-law analysis." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397, 395 (2d Cir. 2001) (citations omitted).  "Stated another way, in these cases the situs of the property is not dispositive of our choice-of-law analysis." *Id.*

The District Court agreed that "[s]itus is not dispositive because, as in *Fieger*, the dispute here is less about real estate located in another jurisdiction and *more about the contract allegedly formed in New York*."  A-227 (emphasis added).

Applying the New Jersey Licensing Statute, where, as here, virtually no activity was performed in New Jersey, and where the plaintiff was both a New York admitted attorney and a New York licensed broker, courts in this Circuit have determined that New York law should apply.  *Dragushansky*, 2013 U.S. Dist. LEXIS 124074, at *15-16 ("The only connection this case has to New Jersey is

20

that the property for which Dragushansky seeks brokerage commissions is located in New Jersey").

Weighing the public policies at issue, it is clear that New York has a greater interest in the dispute than New Jersey. New York courts have held that New York's interest in ensuring its licensed brokers are compensated may outweigh the location of the property. *Advance Realty Assocs.,* 1991 U.S. Dist. LEXIS 4856, at *2-4 (New York had the primary interest where a New York broker sued for commission on the sale of Georgia property); s*ee Charles H. Greenthal Commer. Corp. v. Equity Residential Props. Trust*, 300 A.D.2d 47, 47-48, 751 N.Y.S.2d 181, 182-83 (N.Y. App. Div. 1st Dep't 2002); *see also Rosenberg & Rosenberg, P.C. v. Hoffman*, 195 A.D.2d 343, 344, 600 N.Y.S.2d 228, 229 (N.Y. App. Div. 1st Dep't 1993) (noting that "the interest of New York in seeing that its licensed brokers are compensated on contracts arising from initial contacts in New York and made in New York for obtaining financing from whatever source and the fact that a New York source was found and the loan commitment issued and the loan agreement closed in New York would indicate the propriety of the application of New York law").

In *Charles H. Greenthal*, the plaintiff sought to recover a real estate brokerage commission arising out of the sale of real property located in Connecticut. 300 A.D.2d at 47, 751 N.Y.S.2d at 182. The First Department held

that "the trial court properly determined that Connecticut law did not apply and that, accordingly, plaintiff's claim was not barred by Connecticut's statutory requirements that a broker have a Connecticut license and that a brokerage agreement be in writing." *Id.* (citation omitted).  The court continued: "While the property is located in Connecticut, this fact is outweighed by the numerous New York contacts, including New York's interest in seeing that its licensed real estate brokers are compensated." *Id.*

In *Fieger*, the plaintiff, a New York consultant and financial advisor, sued to recover a commission based upon a sale-and-leaseback transaction involving property located in Connecticut.  251 F.3d at 389.  Among other contacts, the plaintiff negotiated the deal from his New York office, received correspondence from other parties in New York at his New York office, and communicated with company representatives in New York.  *Id.* at 397.  The court concluded that New York law applied because of those contacts and "New York's policy interest in recognizing the importance of the state's professional brokers in arranging complex international financing transactions."  *Id.*

In the instant case, the District Court stated that "[w]eighing the public polices at issue, New York has an interest in seeing that its brokers are compensated, but New Jersey has an equal if not greater interest in asserting 'a significant substantive policy of the state,' which is to ensure that those who broker

22

New Jersey real estate transaction are qualified under New Jersey law." A-227-228. However, the District Court did only a superficial analysis of the New Jersey public policy at issue, and applied undue weight to its misinterpretation.

The cases cited by the District Court do state that the N.J. Licensing Statute expresses the state's public policy: "It is evident . . . from the legislative language and its construction by the courts of New Jersey, that the Act is a strong expression of public policy. It comes well within a reasonable exercise of the police power of the State to protect the public from fraud, misrepresentation, incompetence and sharp practice." *Weston Funding Corp. v. Lafayette Towers, Inc.*, 550 F.2d 710, 714 (2d Cir. 1977) (citing *Stahl v. Twp. of Teaneck*, 162 F. Supp. 661, 667-69 (D.N.J. 1958)). (citations omitted). However, the strong public policy at issue is to protect consumers from sharp practice by unscrupulous third party brokers, a public policy *not* at issue in this case.

A review of the purpose of the New Jersey Licensing Statute further establishes that it does not, and ought not to, apply to employees to bar claims for compensation from their employers. The statute's purpose is "to protect **consumers** by excluding 'undesirable, unscrupulous and dishonest persons . . . from the real estate business,'" and where this purpose would not be served by dismissing a plaintiff's claim a court can decline to do so. *Sammarone v. Bovino*, 395 N.J. Super. 132, 138, 928 A.2d 140, 144 (N.J. Super. App. Div. 2007)

23

(emphasis added) (quoting *Statement to Assembly Bill* 143 (1921)); *see also Tobias v. Comco/America, Inc.*, 96 N.J. 176, 180, 475 A.2d 40, 43 (N.J. 1984) ("The basic policy of the real estate license act is to protect consumers . . . . "); *Kazmer-Standish Consultants, Inc. v. Schoeffel Instruments Corp.*, 89 N.J. 286, 290, 445 A.2d 1149, 1151 (N.J. 1982) ("The purpose of that act is to protect consumers. . . .").

On the facts alleged in the Amended Complaint, New Jersey's public policy in favor of protecting consumers is not implicated, and therefore is outweighed by New York's interest in seeing that employees (and brokers) under New York employment contracts get paid in accordance with the terms of their agreements. New York's strong policy interest, along with its extensive contacts with the facts of this case, show that New York has the most significant involvement and relationship with the transaction and the parties. Thus, whether this is considered an employment agreement case or a brokerage case, New York law should apply.

> **(c)    Under New York Law, Podlin is entitled to recover his commission.**

As discussed *supra*, the agreement between Podlin and the Defendants was not a real estate brokerage agreement, Podlin did not act as a broker, and the commission he seeks in this action is not a real estate commission. However, even if the agreement at issue here were analyzed as a real estate brokerage commission

24

agreement, under New York law Podlin would be entitled to recover his commission. *Dragushansky*, 2013 U.S. Dist. LEXIS 124074, at \*15-16.

"Under New York law, to state a contractual claim for commission, a broker must prove that the broker is duly licensed; that it had a contract, express or implied, with the party to be charged with paying the commission; and that it was the procuring cause of the sale." *Fieger*, 251 F.3d at 402 (citing *Friedland Realty Inc. v. Piazza*, 273 A.D.2d 351, 351, 710 N.Y.S.2d 97, 98 (N.Y. App. Div. 2d Dep't 2000)). Here, Podlin has adequately alleged that he is a duly-licensed broker who had a contract with Triple Five and the Ghermezians. A-122, 131, 134-136. He likewise has adequately alleged facts indicating that he was the procuring cause of the Xanadu deal. A-150-151, 153-154.

In the alternative, Podlin may recover his commission in quantum meruit (also addressed *infra*) because he has alleged sufficient facts demonstrating that Defendants were enriched at Podlin's expense and that "equity and good conscience require that the defendant should compensate the plaintiff." *Fieger*, 251 F.3d at 403. Like the contractual claim for a commission, a plaintiff seeking to establish a quantum meruit claim for a commission must demonstrate that he was the procuring cause of the transaction. *See id.*; *Edward S. Gordon Co. v. Peninsula N.Y. P'ship*, 245 A.D.2d 189, 190, 666 N.Y.S.2d 170, 170 (N.Y. App. Div. 1st Dep't 1997) (affirming quantum meruit recovery of a commission). Podlin

has adequately alleged facts demonstrating that he was the procuring cause of the Xanadu deal.  A-150-151, 153-154.

Podlin is the procuring cause because there is "a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation" of a deal. *Greene v. Hellman*, 51 N.Y.2d 197, 206, 433 N.Y.S.2d 75, 81 (N.Y. 1980).  To establish either a contractual or quantum meruit claim for a commission, a plaintiff must allege sufficient facts demonstrating "that he or she has performed acts of sufficient importance to the success of the deal that he or she should be reimbursed for his or her efforts."  *Fieger*, 251 F.3d at 403 (citing *Greene*, 51 N.Y.2d at 206, 433 N.Y.S.2d at 81); *Eugene J. Busher Co. v. Galbreath-Ruffin Realty Co.*, 22 A.D.2d 879, 879, 254 N.Y.S.2d 673, 674 (N.Y. App. Div. 1st Dep't 1964), *aff'd*, 15 N.Y.2d 992, 260 N.Y.S.2d 12 (N.Y. 1965); *see Friedland Realty*, 273 A.D.2d at 351, 710 N.Y.S.2d at 98; *Getreu v. Plaxall Inc.*, 261 A.D.2d 574, 575, 690 N.Y.S.2d 694, 696 (N.Y. App. Div. 2d Dep't 1999).

A New York licensed broker is entitled to a commission even if the property is in another state.  *See Dragushansky,* 2013 U.S. Dist. LEXIS 124074, at *15-16, (New York licensed broker entitled to fees where property located in New Jersey); *Fieger*, 251 F.3d at 389-402 (New York licensed broker entitled to fees where property located in Connecticut).  The court in *Fieger* found that "[w]hether a

26

party acted as a broker and whether he or she was a procuring cause entitled to a commission are questions of fact to be determined by a factfinder." *Id.* at 403.

Here, Podlin was the procuring cause of Triple Five obtaining the consent of the Authority that permitted Triple Five to obtain the redevelopment rights for the Xanadu project. A-120-121. Podlin "conceived of a specific redevelopment and repositioning plan that he knew would succeed for the project and which would be well-received." A-138. He "made numerous calls and had discussions with his contacts" in New Jersey politics. A-139. He spoke with John Hanson, who had been hired by Governor Chris Christie "to help him solve the 'problems' associated with Xanadu," and made a pitch to Hanson "about the plan he had conceived for the redevelopment and repositioning of Xanadu." A-140-141. He spoke to Authority Board Members about the suitability of Triple Five for the Xanadu project, and he also spoke with potential retail tenants. A-139, 141. He set up and chaired the seminal teleconference with Hanson. A-140-141. He ultimately secured the support of the people required to obtain the consent of the Authority. A-140-141. These facts, accepted as true (as they must be), sufficiently allege claims that Podlin earned his commission because he "unquestionably generated a chain of circumstances which proximately led to the ultimate lease of the premises" and the granting of the required consents for Triple Five to redevelop the Xanadu project. *Eugene J. Busher*, 22 A.D.2d at 879, 254 N.Y.S.2d at 674.

2.    The New Jersey Real Estate Broker's Licensing Statute Does Not and Should Not Be Applied to Employment Agreements.

Even if New Jersey law is applied to the employment agreement at issue, Podlin is still entitled to pursue his claims for the commission portion of his compensation.

The District Court did not dismiss Podlin's employment contract claim in its entirety.  Instead, the District Court dismissed the contract claim "as to any commission relating to the Xanadu transaction," and allowed the claim for "breach of contract for a monthly salary [to] proceed to discovery."  A-235.

Implicit in this decision by the District Court is the determination that Podlin has alleged a valid employment contract (subject only to the District Court's holding on the applicability of the New Jersey Licensing Statute).  The Amended Complaint clearly sets forth the terms of the Employment Agreement:

> 145.  Pursuant to the Employment Agreement, each of Podlin, the Triple Five Defendants and the Ghermezians specifically agreed that (i) Mark Podlin was hired as CEO of the Triple Five International Mall Development Group; (ii) that the Triple  Five Defendants and the Ghermezians would pay to Mark Podlin (a) a set, non-refundable salary of $12,000 per month;  (b) commissions in the amount of 10% of the appraised real estate value of every deal Mark Podlin brought in to Triple Five; (c) an additional 10% of the "increased value" of the project over time after development or redevelopment; and (iii) in the event that Mark Podlin were [sic] successful in getting the Xanadu deal for Triple Five (which he was), Mark Podlin would oversee the entire Xanadu redevelopment operation subject to reasonable involvement by the Ghermezian family.

A-150.

Accordingly, the District Court upheld the sufficiency of Podlin's allegations of an oral employment agreement, but determined that he could not recover *some* of the alleged employment compensation (the commission based portion) due to the alleged applicability of the New Jersey's Licensing Statute, but was permitted to pursue claims for compensation as to other aspects of the agreement. A-223-235. The District Court erred in so holding.

The Statute in question defines "real estate broker," for purposes of the licensing requirement, as follows:

> A real estate broker, for the purposes of R.S.45:15-1 et seq., is defined to be a person, firm or corporation who, for a fee, commission or other valuable consideration, or by reason of a promise or reasonable expectation thereof, lists for sale, sells, exchanges, buys or rents, or offers or attempts to negotiate a sale, exchange, purchase or rental of real estate or an interest therein, or collects or offers or attempts to collect rent for the use of real estate or solicits for prospective purchasers or assists or directs in the procuring of prospects or the negotiation or closing of any transaction which does or is contemplated to result in the sale, exchange, leasing, renting or auctioning of any real estate or negotiates, or offers or attempts or agrees to negotiate a loan secured or to be secured by mortgage or other encumbrance upon or transfer of any real estate **for others** . . . .

N.J. Rev. Stat. § 45:15-3 (emphasis added).

That the language "for others" is intended to convey that a person who does work for his own company/employer does not fall within the general definition of "real estate broker" is made clear by language added in the 1953 amendment of section 3 which **specifically includes employees** in the singular case of selling lots or parcels:

29

the term 'real estate broker' shall also include any person, partnership, association or corporation **employed by or on behalf of the owner or owners of lots or other parcels of real estate, at a stated salary, or upon a commission, or upon a salary and commission, or otherwise**, to sell such real estate, or any parts thereof, in lots or other parcels, and who shall sell or exchange, or offer or attempt or agree to negotiate the sale or exchange, of any such lot or parcel of real estate.

*Id*. (emphasis added).

There is no New Jersey case applying the New Jersey statute in the context of an employment agreement (other than the specific case of the sale of lots or parcels). Plaintiffs have found no New Jersey case (and Defendants have cited none) where the New Jersey Licensing Statute was applied to bar an employee from receiving employment compensation. [3]

In *Palkoski v Garcia*, 19 N.J. 175, 115 A.2d 539 (N.J.1955), the New Jersey Supreme Court was confronted with the question of whether the New Jersey Licensing Statute applied to "employees" where, in a suit for commissions, the plaintiff argued the statute was no bar because he was an "employee." The Supreme Court acknowledged the merit of the legal argument that employees are

---

[3] In the only New York case which has a similar factual scenario, *Dragushansky,* 2013 U.S. Dist. LEXIS 124074, at *15-16, the New York District Court did a choice of law analysis between New York and New Jersey law for the claim of a New York broker who was an "employee," however, it does not appear from the decision that anyone raised the question of whether the New Jersey Licensing Statute even applies to "employees." The question was not necessary to the decision because the Court held that New York law applied.

not covered by the definition of "broker" while rejecting the plaintiff's position on

the factual grounds that the plaintiff was not an "employee":

> The 1953 amendment of section 3 [relating to 'lots' quoted above] does not signify a different legislative understanding of the sense of the pre-existing statute.  Where the 'sale of lots' is concerned, the 'real estate broker' subject to license includes any person or corporation employed by the owner of the lots 'at a stated salary, or upon a commission, or upon a salary and commission, or otherwise, to sell such real estate, or any parts thereof, in lots or other parcels.'  In other words, where lots are involved, an *'employee'* of the corporate owner is also under the requirement of license, whether the employment be on a salary or a commission basis.  But that does not mean that under the prior act the corporate owner of real property could enlist the services of an unlicensed broker, ***not in its regular employ***, to sell or rent its property, as a hiring or employment not within the licensing act.  Now, ***in the sale of lots, even a regular salaried employee of the corporation is under the statutory disability unless he is licensed***.  There is a difference between a regular employee engaged in the pursuit of the corporate employer's general business and an outsider retained to render a purely brokerage service that is made the subject of license in the common interest. The case at hand is in the latter category.

*Palkoski*, 19 N.J. at 181, 115 A.2d at 542 (emphasis added).

A review of the purpose of the New Jersey Licensing Statute further

establishes that it does not, and ought not, apply to employees to bar claims for

compensation from their employers.    The statute's purpose is "to protect

**consumers** by excluding 'undesirable, unscrupulous and dishonest persons . . .

from the real estate business,'" and where this purpose would not be served by

dismissing a plaintiff's claim a court can decline to do so.  *Sammarone*, 395 N.J.

Super. at 138, 928 A.2d at 144 (emphasis added) (quoting *Statement to Assembly*

*Bill* 143 (1921)); *see also Tobias*, 96 N.J. at 180, 475 A.2d at 43 ("The basic policy

31

of the real estate license act is to protect consumers . . . . "); *Kazmer-Standish*, 89

N.J. at 290, 445 A.2d at 1151 ("The purpose of that act is to protect

consumers. . . .").

Accordingly, it is respectfully submitted that, based upon the language of the

statute itself, the legislative history of the statute and the cases which

have discussed and construed the breadth and purpose of the statute, New Jersey's

Licensing Statute does not act to bar Podlin's claims for compensation from

Defendants in connection with his role in obtaining for Defendants the

redevelopment rights for Xanadu.

### 3.    Triple Five's Involvement With Xanadu Was A Business Transaction, Not A Purchase And Sale of Real Estate.

The statutory requirement that a real estate broker be licensed in order to

maintain an action for a real estate commission is not relevant in this case because

the commissions owed to Podlin by Triple Five were not for work on a "real

estate" transaction.

Podlin did not act as the "broker" of a real estate transaction.  Indeed, the

Amended Complaint makes no mention of any brokerage agreement and instead

refers only to an "employment agreement."  A-119-120, 131-132, 142, 144, 150-

151.[4]  This is not merely an argument in favor of form over substance, as the facts alleged in the Amended Complaint clearly make out an employment relationship.

Podlin was hired by Triple Five as an at-will employee to work on *multiple projects* – including the Xanadu project.  A-119, 131.  As an employee of Triple Five, Podlin's responsibilities included convincing the Authority to choose Triple Five for the redevelopment of the Xanadu project.  A-120, 133.

The Xanadu project was a business transaction, in which Defendants obtained the right "to take over the development of the long-dormant mall. . . . As envisioned by the Triple Five Group, [Xanadu, renamed American Dream@Meadowlands] will be the largest retail and entertainment complex in the United States and one of the largest, if not the largest, in the world."  A-119.  The project is to include sporting (baseball) facilities, a hotel, office buildings, a retail mall, a water park and an amusement park.  A-146-148, 171-174.

As is clear from the well-pleaded facts of the Amended Complaint, Podlin's efforts were aimed at creating a redevelopment plan based upon Triple Five's strengths and past projects and his own extensive experience and expertise.  A-120, 138.   Among other things, he conceived of a specific redevelopment and repositioning plan that he knew would succeed for the project and which would be

---

[4] Plaintiffs have also alleged a consultancy agreement in the alternative.  A-152-153.

33

well-received by the State of New Jersey and the Sports and Exposition Authority. A-120, 138. This was a critical key to the success of his efforts as the prior development plan had failed and the State and the Authority desperately wanted and needed a redevelopment plan that would succeed. A-120, 138.

He demonstrated that the combination of the Defendants' capabilities and his strategy made Triple Five the right choice for the redevelopment project. A-127-149. As set forth in the Amended Complaint, the Authority accepted Podlin's plan and named Triple Five as the new developer for the Xanadu project. A-146-148. Thus, Podlin was not hired as a real estate broker, nor did he act as one.

Under New York law, which the parties agree is applicable to the employment agreement at issue here,[5] employees may recover commissions arising out of employee or consulting agreements. Under New York law, an earned commission "cannot be forfeited," and New York recognizes "a long-standing policy against the forfeiture of . . . earned, uncollected commissions as well." *Arbeeny v. Kennedy Exec. Search, Inc.*, 71 A.D.3d 177, 182, 893 N.Y.S.2d 39, 42-43 (N.Y. App. Div. 1st Dep't 2010); *see Cohen v. Lord, Day & Lord*, 75 N.Y.2d 95, 100-02, 551 N.Y.S.2d 157, 160 (N.Y. 1989).

---

[5] Defendants concede, and Plaintiffs agree, that New York law governs the oral employment (or consulting) agreement between Podlin and Triple Five.

34

Under the circumstances, the District Court should have sustained the Amended Complaint because it does not plead a claim for brokerage commissions, and although Defendants have raised the defense that Podlin was a "broker" and not licensed in New Jersey, "[w]hether a party acted as a broker and whether he or she was a procuring cause entitled to a commission are questions of fact to be determined by a factfinder." *Fieger*, 251 F.3d at 403.

### 4.   New Jersey's Licensing Statute Does Not Bar Podlin's Recovery Under The Facts Pled In This Case.

Under New Jersey law, even where a plaintiff's services "fall within the literal scope of the statute," a court may decline to apply the statute in circumstances where to do so would be contrary to its purpose. *Sammarone*, 395 N.J. Super 132 at 140, 928 A.2d at 140; *see also Tobias*, 96 N.J. at 180-82, 475 A.2d at 43-45. The statute's purpose is "to protect consumers by excluding 'undesirable, unscrupulous and dishonest persons . . . from the real estate business,'" and where this purpose would not be served by dismissing a plaintiff's claim a court can decline to do so. *Sammarone*, 395 N.J. Super 132 at 138, 928 A.2d at 144 (quoting *Statement to Assembly Bill* 143 (1921)); *see also Tobias*, 96 N.J. at 180, 475 A.2d at 43 ("The basic policy of the real estate license act is to protect consumers . . . . "); *Kazmer-Standish*, 89 N.J. at 290, 445 A.2d at 1151 ("The purpose of that act is to protect consumers. . . .").

In *Sammarone*, where the defendants were sophisticated businessmen who used their knowledge of the requirements of the real estate broker statute to take advantage of the plaintiff, the court decided not to dismiss plaintiff's claim for a commission even though he fell within the statute's "literal scope." *Sammarone*, 395 N.J. Super 132 at 138, 928 A.2d at 144. The defendants were not the vulnerable "consumers" that the statute was intended to protect, and to allow the defendants to rely on the statute to dismiss the plaintiff's claim would enable them to "'convert the statute from a shield to protect the public into a sword.'" *Id.* at 142 (quoting *Tobias*, 96 N.J. at 180, 475 A.2d at 45). As stated by the New Jersey Supreme Court in *Tobias*,

> Defendants appear to be sophisticated businessmen experienced in real estate transactions. From that perspective, foreclosing plaintiff from maintaining her cause of action would frustrate rather than fulfill the purpose of the act, the protection of consumers from unscrupulous brokers. . . Dismissal of the complaint would convert the statute from a shield to protect the public into a sword to cut off a broker's right to an earned commission.

*Tobias*, 96 N.J. at 182, 475 A.2d at 45 (citing *Kazmer-Standish,* 89 N.J. at 290, 445 A.2d at 1151).[6]

In the case before the Court, the Amended Complaint portrays the defendants as sophisticated businesspeople with extensive knowledge of real estate transactions. By no means are they the vulnerable consumers that the statute was

---

[6] Notably, it is not necessary for the plaintiff to be unschooled in real estate transactions to avail himself of this policy consideration. In *Tobias*, the plaintiff was a real estate broker.

intended to protect.  To the contrary, in this case it is Podlin who acted in good faith but fell vulnerable to a powerful counterparty that, as alleged in the Amended Complaint, acted dishonestly and fraudulently.

On this basis, even if the Xanadu business deal were a real estate transaction that fell within the literal scope of the New Jersey real estate licensing statute (which Plaintiffs maintain it does not) Plaintiffs' claim nonetheless should not be dismissed.   The law in New Jersey under *Tobias* and *Sammarone* is that sophisticated defendants who act dishonestly and unscrupulously may not use the real estate licensing statute as a sword against plaintiffs who acted in good faith.

> 5.    New Jersey Law Does Not Bar Podlin From Receiving Compensation Based Upon The Non-Real Estate Assets Conveyed In The Xanadu Transaction.

Finally, New Jersey law recognizes that complex business transactions may tangentially involve real estate and, in those instances, the requirements of the licensing statute do not prevent a plaintiff from obtaining a commission on the non-real estate portion of the deal.  *See Kazmer-Standish*, 89 N.J. at 288-94, 445 A.2d at 1150-53.

In *Kazmer-Standish*, the New Jersey Supreme Court determined, in a consolidated appeal, that even though plaintiffs did not have a license to sell real estate in New Jersey, they were owed commissions for the non-real estate portion of the deals they procured.  *Id*.  The court recognized that an honest plaintiff should

not be deprived of a commission on a transaction he procured simply because it includes an interest in real estate. *Id*. at 293. This is especially true when the plaintiff is dealing with other "sophisticated businessmen in complex transactions." *Id*. at 292-93.

The *Kazmer-Standish* Court also specifically held that "a business broker should not be deprived of a commission merely because the value of the real estate is greater than the value of other assets in a going concern. The personalty of an ongoing business, even when it is less valuable than the real property, may be substantial and provide a basis for a significant commission." *Id*. at 294.

Here, the Amended Complaint alleges that the Xanadu deal included the conveyance of significant non-real estate interests, including redevelopment rights, and the non-real estate rights and interests associated with the entertainment, recreation and retail facilities, baseball facilities, hotel, offices, water park and amusement park. A-146-148. Accordingly, under any scenario, Plaintiffs are at least entitled to commission based on the foregoing non-real estate portion of the Xanadu deal.

## II. The District Court Committed Reversible Error in Dismissing Plaintiffs' Fraud Claims.

### A. Plaintiffs' Fraud Claims are Pled In The Alternative

As an initial matter, Plaintiffs' fraud claim is not duplicative of Plaintiffs' breach of contract claim because Defendants dispute the very existence of the

employment contract, and Plaintiffs are permitted to plead in the alternative. *See* Fed. R. Civ. P. 8(d).

Defendants do not admit the existence of a contract. If Defendants were to succeed in this assertion, Plaintiffs should be permitted to proceed with their fraud claim as there would then be no possibility of duplication.

Admittedly, there are several district court cases that have found that even where the existence of the contract is disputed, pleading fraud in the alternative is not permitted. *See e.g., Marriott Int'l, Inc. v. Downtown Ath. Club of N.Y. City, Inc.,* No. 02 Civ. 3906 (MBM), 2003 U.S. Dist. LEXIS 9570, at *22 n.5 (S.D.N.Y. June 6, 2003); *Atla-Medine v. Crompton Corp.*, No. 00 Civ. 5901 (HB), 2001 U.S. Dist. LEXIS 5427, at *4 (S.D.N.Y. Apr. 26, 2001) ("[T]he 'extraneous to a contract' exception of *Bridgestone/Firestone* is not satisfied simply because a jury could find that there was no contract. . . It is illogical to speak of a statement being 'extraneous' to that which does not exist ...."); *Town of Haverstraw v. Columbia Elec. Corp.*, 237 F. Supp. 2d 452, 456 (S.D.N.Y 2002) (concluding that "[e]ven though the breach of contract claim and the fraud claim are pleaded in the alternative, it does not follow that the fraud claim is collateral to the alleged breach of contract" where "the statement on which the Town bases its fraud claim is the exact statement that the Town claims created the contract").

It is respectfully submitted that such holdings are illogical and should not be adopted as the law in this Circuit by this Court. If the factual statements at issue have been made and were false, there is no reason for not allowing them to be the basis of a fraud claim if a jury finds there was no meeting of the minds for purposes of forming a contract. Contrary to the statement made by the court in *Atla-Medine,* there is nothing illogical about this situation, as it is the contract which may not exist, not the statements themselves. The jury can still find that all of the elements of fraud are present even if all of the elements of a valid contract are not.

### B.    Plaintiffs' Fraud Claims are Not Duplicative of Plaintiffs' Breach of Contract Claim

Plaintiffs properly alleged fraud claims based on Defendants' misrepresentations, which induced Podlin to enter into the employment agreement. *See Barkley v. Olympia Mortg. Co.*, Fed. Appx. 22, 26 (2d Cir. 2014) ("where a party makes representations to induce the other party to enter a contract, the fraud claim is sustained") (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89 (1986)). In order to state a claim for fraud or fraudulent inducement, a plaintiff must allege that "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance." *Nasik Breeding &*

40

*Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 528 (S.D.N.Y. 2001); *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (citing same).

In order to satisfy Rule 9(b), "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted); *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 308 (S.D.N.Y. 2009) (citing same).

Here, the Amended Complaint enumerated multiple fraudulent statements that Defendants made to Plaintiffs, including the following: (1) that Podlin was to be hired as CEO of the Triple Five International Mall Development Group; (2) that the Triple Five Defendants and the Ghermezians would pay to Plaintiffs (a) a fixed, non-refundable salary of $12,000 per month, (b) commissions in the amount of 10% of the appraised real estate value of every deal Plaintiff brought in to Triple Five (including but not limited to the Xanadu project), (c) an additional commission equal to 10% of the "increased value" of any such project over time after development or redevelopment; and (3) in the event that Plaintiffs succeeded in getting the consents for the Xanadu deal for Triple Five, Podlin would oversee the entire Xanadu redevelopment operation subject to reasonable involvement by the Ghermezian family. A-131, 156. Further, the Amended Complaint makes

41

clear that the above-mentioned promises and statements were made by Nader during Plaintiff's meeting with Defendants at the Triple Five New York Headquarters Office on February 24, 2010 and re-confirmed at a subsequent meeting at the same location on February 25, 2010.  A-129-136.  Finally, the above-mentioned statements are fraudulent because Defendants clearly and unequivocally did not intend, <u>at the time such statements were made</u>, to perform any of these stated promises and obligations.

In addition, the Amended Complaint alleges that Nader falsely stated that a written employment agreement was being drafted by his in-house attorney.  A-120, 136.  Nader made up excuse after excuse, always promising that the document would be forthcoming without any intention ever to produce or sign such a document.  A-120.  Subsequently, Nader falsely indicated that the agreement had to be restructured as a consulting arrangement due to internal business and political reasons.  A-120.  All of this was a means of buying further time while keeping Podlin focused on bringing in the Xanadu project and to keep him working on other matters.  A-120.  These "post-contract" statements are collateral to the actual underlying contract itself.

The Amended Complaint delineates the specifics of Podlin's reliance on these false promises and statements and the resultant actions, conduct and efforts he undertook in reliance thereon to his ultimate detriment and damage.  A-118-

42

149.   Defendants made multiple material false representations and promises –
including misrepresentations extraneous to their agreement – that were intended to
induce Podlin to work on Defendants' behalf to, among other things, pursue and
obtain the Xanadu deal for Triple Five.  A-118-149.

Podlin relied on and was induced by such statements and promises and acted
with due diligence and in good faith to fulfill his obligations pursuant to the
employment contract to his ultimate detriment and damage.  *See, e.g.*, *Barkley*, 557
Fed. Appx. at 22 (affirming finding of fraud where plaintiffs were induced to enter
contracts based on defendants' misrepresentations); *Deerfield Commc'ns*,
68 N.Y.2d at 956, 510 N.Y.S.2d at 89 (affirming denial of motion to dismiss
counterclaim for "fraud in the inducement in that plaintiff had no intention of
abiding by the geographical restrictions orally agreed to"); *Xcellence, Inc. v. Arkin
Kaplan Rice LLP*, No. 10CV3304 (HB), 2011 U.S. Dist. LEXIS 26533, at *10-13
(S.D.N.Y. Mar. 15, 2011) (denying dismissal of fraudulent inducement claim,
finding allegations of material misrepresentations to be sufficient to create an
inference of fraudulent inducement).

Upon reinstatement of the fraud claim, the request for punitive damages
should also be reinstated.

43

**C.    The Conspiracy to Commit Fraud Claim was Erroneously Dismissed**

Finally, the District Court committed reversible error in dismissing Plaintiffs' conspiracy to commit fraud claim.  A-235.  Although New York does not recognize an independent cause of action for conspiracy to commit fraud, allegations of conspiracy to commit fraud are permitted '"to connect the actions of separate defendants with an otherwise actionable tort."'  *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 1st Dep't 2010) (quoting *Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546 (N.Y. 1986)).  Accordingly, under New York Law, to establish a claim of civil conspiracy, the plaintiff "must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abacus Fed. Sav. Bank*, 75 A.D.3d at 474, 905 N.Y.S.2d at 588 (internal quotations and citations omitted).  Plaintiffs established that the Triple Five Defendants and the Ghermezians, acting severally and collectively, fraudulently induced Plaintiffs to work on Defendants' behalf to, among other things, pursue and obtain the deal by which the Triple Five Defendants and the Ghermezians would assume control of Xanadu and rename it the American Dream@Meadowlands, and that Plaintiffs relied in good faith and to their

44

detriment on Defendants' promises and representations and were damaged thereby. A-155-159.

Based on all of the foregoing, the District Court's dismissal of Plaintiffs' claims for fraud and fraudulent inducement was reversible error.

## III. The Complaint Adequately Alleges Facts To Support Piercing The Corporate Veil

To the extent that the District Court intended to bar a veil piercing theory of liability by its single-sentence finding that "the Complaint alleges no facts to support piecing [sic] the veil in this case," (A-234), the order should be reversed because it is both baseless and premature.[7]  As this Court has previously noted, "New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owners exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil." *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) (citing *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11 (N.Y. 1993)); *see also Broadridge Secs. Processing Solutions, LLC v. Khashoggi*, 507 Fed. Appx. 57, 57 (2d Cir. 2013)

---

[7] Plaintiffs do not dispute that an independent cause of action for piercing the corporate veil does not exist without the main claim against the corporation, however, Plaintiffs assert that the District Court erred in foreclosing veil piercing to extend liability of the Triple Five Defendants to the Ghermezians for the reasons discussed herein.

(noting that there are "ten factors that New York courts use to determine whether complete control exists, and no single factor is decisive").  The Amended Complaint adequately alleges a basis for piercing the corporate veil.  In particular, the Amended Complaint clearly sets out factual allegations to support its claim that the Ghermezian defendants exercised complete domination over Triple Five with respect to the employment agreement with Mark Podlin.  Specifically, the Amended Complaint alleges that:

> [T]he Triple Five Defendants have been used as or participated in part of the scheme to defraud Podlin and/or have been used to hold some component of the American Dream@Meadowlands project after it was acquired.
>
> * * *
>
> Nader Ghermezian . . . [i]s an important member of the Ghermezian family, which owns and operates Triple Five and its business interests worldwide.
>
> * * *
>
> While Nader specifically agreed to t[he] oral agreement at that time, Nader stated that before it could be considered final, he needed Mark Podlin to meet his brother Raphael Ghermezian. . . .
>
> * * *
>
> During the latter part of this meeting with Nader and Raphael on Thursday, February 25, 2010, Mark Podlin made a special point of saying to Nader that if Mark Podlin were to be successful in getting the Xanadu deal for Triple Five, then he (Mark Podlin) also wanted the Ghermezians' agreement that he would be the person to run the entire Xanadu redevelopment operation. Nader stated that that was acceptable, but that, of course, the rest of the Ghermezian family would also be involved…
>
> * * *

46

Mark Podlin . . . was able to set up a call with Hanson and key members of the Ghermezian family, including Nader.

Nader convened an international conference call with various members of the Ghermezian family . . . to discuss the overall purpose and objective of the call.

On the call with Hanson, which occurred an hour after the family pre-call, Mark Podlin took the lead and made introductions . . . and stated that based on his experience in redeveloping major enclosed malls, the Ghermezian Family had hired him as CEO of Triple Five's International Mall Development Group…

\* \* \*

Mark Podlin . . . followed up with emails to [Authority Board Members] and to Nader and other members of the Ghermezian Family.

\* \* \*

Mark Podlin called Nader and Don Ghermezian and asked them if they wanted to try to resolve the issues between them. . . .  Mark Podlin received an email from Don Ghermezian saying he (Don) was doing the redevelopment work that they didn't need Mark Podlin.

\* \* \*

[T]he Ghermezians completely dominated the Triple Five Defendants, such that the Triple Five Defendants were a mere device to further the Ghermezian's personal business and fraud upon Podlin.

[T]he Triple Five Defendants were interrelated, with overlapping control and ownership, and which did not and do not abide by the necessary corporate formalities.

\* \* \*

While Mark Podlin explained to the Ghermezians that there was no guarantee that he could get control of Xanadu, Mark Podlin stated that he was confident that his efforts might be the *only* avenue to get control of the project for the Ghermezians and the Triple Five Defendants.

\* \* \*

47

> The Triple Five Defendants are mere instrumentalities of one another and of the Ghermezians. The separate existence of each must be disregarded to hold each individually and severally liable for the acts, debts and obligations of the others.
>
> The Ghermezians' control and domination of the Triple Five Defendants was used to defraud Podlin as set forth above, and they should be held individually and severally liable for the debts of the Triple Five Defendants and each other.
>
> The fraudulent [act] of the Ghermezians and the Triple Five Defendants was the proximate cause of the damages suffered by Mark Podlin and Podlin Int'l.

A-125-126, 128, 132-135, 140, 142, 145, 159-160. The Amended Complaint similarly makes clear that the Ghermezians' domination of Triple Five was used to effectuate the fraud against Mark Podlin by engaging and promising employment with Triple Five and then utilizing the corporation to ultimately renege on the agreement. A-120, 142 (hiding behind the "in-house lawyer['s]" work load and the "internal business" reasons for restricting the agreement into a consulting agreement).) Having stated a sufficient basis for piercing the corporate veil in the Amended Complaint, Plaintiffs should be afforded the opportunity to engage in discovery accordingly and to ultimately present its case on veil piercing to the trier of fact in due course.

The District Court was wrong in dismissing the claim on the basis that no separate cause of action exists to pierce the corporate veil under New York law. A-235. To the contrary, bringing a claim to pierce the corporate veil in the instant action is entirely appropriate. *See Samsung Am. v. Yugoslav-Korean Consulting &*

*Trading Co.*, 248 A.D.2d 290, 291, 670 N.Y.S.2d 466, 468 (N.Y. App. Div. 1st Dep't 1998) ("a plaintiff may seek judgment against a corporation and to pierce the corporate veil all in one action."); *Kolodny v. Byrne*, No. 11-28718, 2012 N.Y. Misc. LEXIS 4873, at *5 (N.Y. Sup. Ct. Suffolk Cnty. Oct. 11, 2012). In fact, as the case cited by the District Court makes clear, A-234, a claim for piercing the corporate veil should, like here, be brought in the same action as the one against the corporation. *RTC Mortg. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d, 192, 203 (S.D.N.Y. 2001), *aff'd*, 31 Fed. Appx. 37 (2d Cir. 2002) ("In this Court's view, the Trust is seeking relief that properly should have been sought in the 1996 action on the Guaranty before Judge Chin.").

The District Court erred and should be reversed to the extent its order sought to preclude the argument as a basis of imposing liability on certain defendants altogether, because the basis of such liability is adequately alleged in the Amended Complaint and its decision to preclude the argument is premature at this early stage of the case.

If the Court does not reverse the District Court's dismissal of the piercing claim, it should at least reverse the "with prejudice" dismissal and make it without prejudice. Unlike the other claims, if a judgment is obtained against the corporate defendants and it appears that they make themselves judgment proof, Plaintiffs should not be foreclosed from seeking to hold the principals liable on the judgment

upon a showing of facts justifying piercing the corporate veil at some point in the future.

## IV. The District Court Improperly Limited Podlin's Unjust Enrichment and Quantum Meruit Claims

The sixth and seventh causes of action in the Amended Complaint seek damages under unjust enrichment and quantum meruit theories of liability. A-160-163. These claims are "an alternative to the contract claim," as the District Court properly recognized. A-231; *see Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories."). However, the District Court improperly limited the potential recovery on these claims to one month's salary based upon its finding that the New Jersey Licensing Statute barred recovery for the commission on the Xanadu project. A-235.

As set forth in Section I *supra,* Podlin may recover his commissions because the New Jersey Licensing Statute does not act as a bar to him doing so. Accordingly, if the jury were to find that no contract exists, Podlin should be permitted to get the reasonable value of his services in connection with the Xanadu project under an unjust enrichment and/or quantum meruit theory.

Under New York law,[8] unjust enrichment and quantum meruit are properly "analyzed together as a single quasi-contract claim." *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir 2005).  A quasi-contract claim is appropriate in the absence of an agreement if "the defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Bradkin v. Leverton*, 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 196  (N.Y. 1970); *see also Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 471 (N.Y. 2011); *Miller v. Schloss*, 218 N.Y. 400, 407 (N.Y. 1916).  "[T]o recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill*, 418 F.3d at 175 (citation omitted); *see Thomas J. Hayes & Assoc. v. Brodsky*, 101 A.D.3d 1560, 1561, 957 N.Y.S.2d 473, 474 (N.Y. App. Div. 3d Dep't 2012) (reciting same four elements for quantum meruit), *lv denied*, 21 N.Y.3d 851 (2013).

---

[8] As the District Court noted, the parties agree that New York law applies to Podlin's unjust enrichment and quantum meruit claims.  A-230.

51

Here, the District Court properly concluded that the Complaint includes factual allegations satisfying each of these elements, and that Podlin therefore pleaded a "textbook claim for unjust enrichment." A-231. However, the District Court limited Podlin's unjust enrichment and quantum meruit claims to "the reasonable value of a month's work as CEO of Triple Five," erroneously concluding that Podlin "could not claim the full benefit of the alleged bargain in unjust enrichment," and that the reasonable value of Podlin's services equaled "a monthly salary." A-231, 235. New York law does not support this conclusion.

In *Brodsky*, the plaintiff was "a licensed automobile dealership broker from Connecticut" who contracted with a car dealership owner to sell his "Ford and Chevrolet car dealerships" in New York. 110 A.D.3d at 1560, 957 N.Y.S.2d at 474. As part of the transaction, the buyer purchased "the land on which the dealerships were located" and "agreed to accept financial responsibility for paying plaintiff's commission," but the parties "never reached an agreement as to the amount of the commission." *Id.* After the property was conveyed to the buyer for $3 million, the plaintiff refused the buyer's "offer to pay a one percent commission" and sued "alleging causes of action in breach of contract and quantum meruit for the failure to pay a broker's commission fee." *Id.* at 1561. After a bench trial, the trial court credited the plaintiff's expert over the defendant's expert regarding the reasonable value of the plaintiff's services, "found

52

that no enforceable contract existed between the parties and, on the quantum meruit claim, the reasonable value of plaintiff's services was five percent of the purchase price." *Id.*

The Appellate Division affirmed, "conclud[ing] that it was appropriate in determining the reasonable value of the services performed by plaintiff to consider the commission it would have received had an agreement been in place at the customary rate in the community during the time in which the services were rendered." *Id.* at 1562. The Appellate Division reasoned that because liability was premised on quantum meruit, the defendant was "bound to pay plaintiff the reasonable amount of plaintiff's services, as determined by the trier of fact." *Id.* at 1563. The Appellate Division continued: "In real estate transactions, the value of the services rendered are routinely measured as a percentage of the sale price, as opposed to the number of hours expended to broker the deal." *Id.* Considering the plaintiff's efforts in bringing the parties together and encouraging and convincing the buyer "to complete the transaction," the Appellate Division "conclude[d] that the reasonable value of plaintiff's services was appropriately calculated." *Id.*

Here, the unjust enrichment and quantum meruit claims are worth more than merely one month's salary because the reasonable value of Podlin's services depends, as in *Brodsky*, not on the amount of time spent brokering the Xanadu deal, but rather on a percentage of the value of the transaction. This is because the

53

value of Podlin's services depends on the unique blend of experience, specialized skills, and established relationships he possesses. Indeed, these unique attributes were the reason Triple Five hired Podlin in the first place. A-118-121, 127-128. Moreover, in determining the reasonable value of Podlin's services, it is appropriate to consider the amount he would have received under the employment agreement. *See Brodsky*, 110 A.D.3d at 1562, 957 N.Y.S.2d at 475. Further, what constitutes the reasonable value of Podlin's services should be determined by a jury. *Id.* At minimum, Podlin is entitled to discovery on the issue of what constitutes the reasonable value of the services he rendered to Triple Five.

Thus, the District Court erred in holding that Podlin's unjust enrichment and quantum meruit claims must be limited to the value of one month's salary. A-235.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs-Appellants respectfully submit that the District Court should be reversed and this action should be remanded to the District Court for further proceedings on the merits.

Dated:   September 30, 2014

Respectfully submitted,

**THOMPSON HINE LLP**

By: _/s/ Richard De Palma_____
      Richard De Palma
      335 Madison Avenue, 12th Fl.
      New York, New York  10017
      Telephone 212.344.5680

      *Attorneys for Plaintiffs-Appellants Mark J. Podlin and Podlin International Realty, Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) (7)(B)(i) in that it contains 12,686 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that it is proportionately spaced typeface Times New Roman using 14-point type by the Microsoft Word program.

Dated:   September 30, 2014

/s/ Richard De Palma
Richard De Palma

*Attorneys for Plaintiffs-Appellants Mark J. Podlin and Podlin International Realty, Ltd.*